**AMERICAN SAMOA GOVERNMENT, Plaintiff,**

**v.**

**RICHARD PATRICK MAJHOR, Defendant.**

High Court of American Samoa
Trial Division

CR No. 10-03
CR No. 21-03

June 16, 2004

Before RICHMOND, Associate Justice, SAGAPOLUTELE, Associate Judge, and TAPOPO, Associate Judge.

Counsel: For Plaintiff, Fiti A. Sunia, Attorney General, Diane Roy, Assistant Attorney General, and Harvey Kincaid, Assistant Attorney General
For Defendant, Andrew T. Stave, Assistant Public Defender

ORDER DENYING MOTION TO WITHDRAW

On February 5, 2004, Defendant Richard Patrick Majhor ("Majhor") filed a motion for the withdrawal of his counsel, Assistant Public Defender Andrew T. Stave ("Stave"). We held a hearing on the motion on March 2, 2004. Majhor renewed the motion to withdraw on May 10, 2004. In support of the renewed motion, Majhor filed an additional *in camera* and *ex parte* supplemental motion to withdraw. We held another hearing on the motion on May 12, 2003.

Majhor's arguments for withdrawal have two main thrusts: that Stave lacks the necessary competence to handle Majhor's capital case; and that Stave's conflicts of interest prevent him from representing Majhor. For the reasons stated below, we deny the motion to withdraw without prejudice. A supplemental opinion, released *ex parte*, will address a related conflict of interest issue concerning privileged defense information.

## Background

On March 20, 2003, Plaintiff American Samoa Government ("ASG") filed a criminal complaint against Majhor and co-defendants Victor "Vic" Sepulona ("Sepulona") and Talofa Seumanu ("Seumanu") for murder in the first degree and related crimes. We appointed attorneys of the Public Defender's office to represent the accused. Public Defender Tautai Aviata Fa`alevao ("Fa`alevao") assumed the responsibilities for Seumanu's defense. Former Assistant Public Defender Sharron I. Rancourt ("Rancourt") took charge of Sepulona's defense. Majhor's co-defendants have now pled guilty and agreed to testify against Majhor. Former Assistant Public Defender Bentley C. Adams ("Adams") initially represented Majhor. On March 21, 2003, we allowed Adams to withdraw. We appointed Arthur Ripley, Jr. ("Ripley") to defend Majhor. Subsequently, Adams left the Public Defender's office. Rancourt also left the Public Defender's office at some point. She continues to represent Sepulona. On June 6, 2003, ASG filed another criminal complaint against Majhor for possession of a controlled substance with intent to distribute. Ripley withdrew from Majhor's defense with our approval on October 31, 2003, which was followed by more attorney changes. We appointed Marie Lafaele as Majhor's attorney but, due to

her criminal defense experience, replaced her with Assistant Public Defender Sachin Mehta ("Mehta") on November 13, 2003. Subsequently, Mehta left the Public Defender's office. Soon after joining the Public Defender's office, specifically December 18, 2003, Andrew T. Stave ("Stave") assumed responsibility for Majhor's defense.

In protecting Majhor's interests, Stave has performed "enthusiastically and conscientiously." (James S. Thompson Dep. at 10.) Stave has filed a number of motions, including motions for change of venue, for the preservation of evidence, for visitation, and for funding for experts. On May 21, 2004, we granted Majhor's motion to fund capital defense experts and authorized him to have such experts, including investigators, to prepare his defense. Currently, we are awaiting a *pro hac vice* motion, which will enable us to appoint a capital defense law firm with experienced attorneys to manage Majhor's defense. "For over two months," Stave has "been in constant contact" with attorneys of a potential *pro hac vice* law firm. (*Id.* at 27.) Once *pro hac vice* counsel is appointed, Stave will not serve as lead counsel. Experienced in death penalty cases, new lead counsel will direct defense strategy and manage local co-counsel, Stave, as appropriate to prepare Majhor's defense under the new lead counsel's direction.

## Discussion

### I. Competence

Majhor argues that Stave is incompetent to act as counsel in a capital case. We find that Stave is competent to act as local co-counsel for a *pro hac vice* capital defense team.

### A. Sixth Amendment Effectiveness of Counsel

 We cannot refuse to appoint counsel to assist in Majhor's defense. *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963); *Tamafili v. Moaali`itele*, 6 A.S.R.2d 15, 19 (Trial Div. 1987). The Sixth Amendment guarantees effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685 (1984); *Tamafili*, 6 A.S.R.2d at 20. Two components constitute a showing of ineffective counsel: counsel's performance must be deficient; and the deficiency must prejudice the defendant. *Strickland*, 466 U.S. at 687. We strongly presume "that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. A counsel's performance is deficient when it falls "below an objective standard of reasonableness." *Id.* at 688.

Applying the *Strickland* standards, the court in *Riley v. Taylor* evaluated the effectiveness of solo lead counsel in a death penalty case who had never handled a murder or capital case. 277 F.3d 261, 271 (3d Cir.

179

2001). The appellate court affirmed the trial court's refusal to appoint co-counsel or an investigator to assist. *Id.* at 271, 306. The *Riley* court reasoned that the defendant failed to show that counsel provided representation below a level of quality defined by the *Strickland* standards. *Id.* at 306. Here, we are considering the likely effectiveness of assistance of counsel prior to trial, rather than evaluating the quality of past representation as in *Riley*. However, *Riley* shows that the assistance of an inexperienced solo attorney is not necessarily ineffective in a death penalty case.

Majhor contends that Stave is ineffective as counsel because he believes Stave cannot explain capital case defense strategy, develop capital defense strategy, or plan mitigation. As a member of the bar with some criminal experience, Stave is capable of representing Majhor. *See Riley*, 277 F.3d at 306. We have no indication that Stave's representation of Majhor has been flawed. Rather, Stave has actively protected Majhor's interests and effectively marshaled resources for Majhor's defense. Furthermore, the defense team that we are preparing to appoint will be more likely to provide effective assistance to Majhor with Stave as a member. He is competent to complete the duties of local co-counsel. Stave can be "responsible to the client and responsible for the conduct of the proceeding" and to advise the client according to his legal judgment. MODEL RULE ON PRO HAC VICE ADMISSION (Recommended draft Aug. 2002), *available at* http://www.abanet.org/cpr/mjp/201f.pdf. In particular, he can ensure that deadlines are met and that Majhor is kept informed about the case. The performance of basic lawyerly duties does not require death penalty experience. Any complex issues that Stave finds himself unable to explain to Majhor can be explained by more experienced members of Majhor's defense team. The lead *pro hac vice* counsel can establish Majhor's defense strategy and direct mitigation efforts. In sum, we deny the motion to withdraw because Majhor is more likely to receive effective assistance of counsel with Stave on the defense team.

B. American Bar Association Guidelines

We find that Majhor incorrectly relies on American Bar Association ("ABA") guidelines to show that Stave's assistance is deficient. Given Supreme Court acceptance, ABA guidelines are generally convincing standards for assessing the reasonableness of an attorney's performance. *Wiggins v. Smith*, 123 S. Ct. 2527, 2536 (2003). However, they are only guides. *See Tamafili*, 6 A.S.R.2d at 20. We may deviate from ABA guidelines when we determine that the deviation will not cause the defendant constitutional harm.

The *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (2003) (hereinafter "*ABA Guidelines*")

state that "every" attorney representing a capital defendant should have "a license or permission to practice in the jurisdiction," a commitment to defending capital cases, and death penalty training. *ABA Guideline 5.1.* Majhor argues that the language of the guideline referring to every defense team attorney prohibits Stave from participating in Majhor's defense. Although Stave does not have the qualifications listed in *ABA Guideline* 5.1, we disagree. An attorney with little death penalty experience does not detract from an otherwise experienced capital defense team. As here, when experienced lead counsel and his law firm will participate on the defense team, there is no sense in requiring that all skills and experience required for the defense reside in every attorney of the defense team. More experienced attorneys can supervise and train Stave. Also, we have no choice but to include an attorney lacking experience on Majhor's defense team for the purpose of having local co-counsel for the *pro hac vice* attorneys. Majhor's *pro hac vice* defense team requires a member of the American Samoa Bar Association as local co-counsel. H.C.R. 145; *ABA Guideline 5.1* (requiring death penalty qualified counsel to have permission to practice in the relevant jurisdiction). Stave can serve as local co-counsel, for we know of no other potential co-counsel admitted to the American Samoa Bar that meets the qualifications of *ABA Guideline* 5.1. The advantages of local co-counsel on Majhor's defense team outweigh any problems associated with Stave's inexperience. Moreover, as Majhor will have a defense team that otherwise meets the standards of the *ABA Guidelines*, his application of *ABA Guideline* 5.1 is overly broad and unreasonable. The experience required by the guidelines can only be gained through experience on death penalty cases. If every attorney on a defense team needs to show commitment to defending death penalty cases and death penalty training in full satisfaction of the *ABA Guidelines*, it would impose an unnecessary restriction on an attorney's ability to gain death penalty experience. This is a particular concern for the bar of American Samoa, which lacks death penalty experience.

Before appointing members of a defense team, the views of lead counsel "should ordinarily" be solicited. *ABA Guideline 10.4.* Majhor argues that Stave is ineffective because Stave was not selected by qualified lead counsel according to *ABA Guideline* 10.4. We disagree because *ABA Guideline* 10.4 has nothing to do with whether Majhor actually receives effective counsel. In any event, the language of the guideline is not mandatory.

Majhor argues that Stave is not qualified to select lead counsel for the capital defense. This does not provide a reason for Stave to withdraw for ineffectiveness; we select and appoint counsel for Majhor.

Counsel for the defense should "conduct a full examination of the defense provided to the client at all prior phases of the case" and ensure

181

"that the official record of the proceedings is complete." *ABA Guideline* 10.7. Majhor argues that an investigation by the *pro hac vice* attorney into the effectiveness of Majhor's prior counsel will create morale problems for Majhor's defense team and the Public Defender's office because Stave and Majhor's other prior attorneys will undergo an investigation of their effectiveness. Majhor believes that an investigation of prior counsel cannot be properly conducted with Stave on the defense team. This argument provides no support for Stave's withdrawal. None of Majhor's prior attorneys, except Stave, remain with the Public Defender's office. Concerning Stave, as he is still on Majhor's defense team, we do not consider him to be prior counsel under the scope of the guideline. In any event, the investigation only presents a potential conflict between Stave and other future members of Majhor's defense. We have inquired into Stave's effectiveness here, and found him adequate in light of the evidence before us. Furthermore, the assistance of attorneys on Majhor's defense team will be scrutinized as the case progresses.

We find that Stave is competent to act as local co-counsel for Majhor's *pro hac vice* capital defense team. In this role, Stave is likely to provide adequate assistance of counsel for Majhor.

## II. Conflict of Interest

Majhor argues that Stave, an Assistant Public Defender, cannot represent Majhor because of Stave's conflicts of interest. We ascertain no conflict of interest that currently prohibits Stave from acting as local co-counsel for Majhor's defense team.

The Sixth Amendment guarantees a defendant "adequate and fair representation," not "perfect representation." *American Samoa Gov't v. Amani*, 2 A.S.R.3d 71 (Trial Div. 1998) (quoting *Strickland*, 466 U.S. at 690). When considering motions to withdraw, we review "the 'facts of the particular case' to determine if a Sixth Amendment violation is present and . . . acts must be assessed according to an objective standard of reasonableness." *Id.* (citations omitted). Representation of co-defendants by different attorneys in the same public defender's office does not violate the Sixth Amendment *per se*. *Id.* at 75; *see, e.g., Graves v. State*, 619 A.2d 123, 127 (Md. Ct. Spec. App. 1993).

Attorneys practicing in American Samoa are subject to the ABA Model Rules of Professional Conduct. H.C.R. 104. As an objective standard, a model rule violation can indicate ineffective assistance of counsel. The model rules provide that "a lawyer shall not represent a client if the representation of that client will be directly adverse to another client." MODEL RULES OF PROF'L CONDUCT R. 1.7 (2002). The lawyer may continue representation if he believes continued

representation will not harm the other client or if "each client consents after consultation." *Id.* The conflict of interest must be actual; a possible or potential conflict of interest is not sufficient to show an ethical violation or ineffective assistance. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). The rules also provide that "while lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so." MODEL RULES OF PROF'L CONDUCT R. 1.10 (2002). The comment to Rule 1.10 states that "whether two or more lawyers constitute a firm within this definition can depend on the specific facts." *Id.* at R. 1.10 cmt. [1]; *see id.* at R. 1.0 cmt. [2]-[4]; *State v. Webb*, 680 A.2d 147, 166.

## A. Office Conflict—Imputed

Majhor contends that under Rule 1.10 a conflict of interest belonging to Fa`alevao is imputed to Stave, because Fa`alevao and Stave are associated in the Public Defender's office. Fa`alevao cannot represent Majhor under Rule 1.7 because Fa`alevao represents Seumanu, who agreed to testify against Majhor. In addition, Majhor contends that Stave is further tainted as a member of the Public Defender's office through imputation under Rule 1.10 because of former Assistant Public Defenders Adams and Rancourt. In sum, Majhor argues that privileged knowledge about Majhor's co-defendants, now witnesses, is imputed to every attorney in the Public Defender's office, conflicting any of them from representing Majhor.

Disagreeing with Majhor, we find that the imputation rule is inapplicable to this case because the attorneys in this case are not associated and because the policy behind the imputation under Rule 1.10 does not require the rule's application. Numerous courts have made exceptions to imputation rules. *See, e.g., Nemours Foundation v. Gilbane*, 632 F.Supp. 418, 430 (D. Del. 1986) (creating exception to Deleware's imputation rule for transitory attorneys). Similarly, some courts have declined to impute knowledge to attorneys who represent co-defendants while in the same Public Defender's office when circumstances of the case permit. *United States v. Reynoso*, 6 F.Supp.2d 269, 271 (S.D.N.Y. 1998) (applying DR 5-105(D), the ABA Model Code provision that corresponds to Rule 1.10); *State v. Webb*, 680 A.2d 147, 166 (Conn. Sup. Ct. 1996); *State v. Pitt*, 884 P.2d 1150, 1156 (Hawaii App. Ct. 1994) (applying Hawaii Rules of Professional Conduct, Rule 1.10); *Graves v. State*, 619 A.2d 123, 127, 133 (Md. Ct. Spec. App. 1993). Following the lead of these courts, we read Rule 1.10 expansively as applied to the Public Defender's office in this case, effectively an exception, because "although rigid application of the law firm disqualification rule might afford an easy solution . . . a rule this broad would result in many unnecessary withdrawals, limit mobility of the legal profession, and restrict the state in the assignment of counsel where no [harm] has in fact

183

occurred." *Webb*, 680 A.2d at 166 (citations omitted, alteration in original).

 We adopt the rule of the *Graves* court to determine when public defenders are associated for the purposes of imputation. The *Graves* court made a thorough survey of case law concerning the imputation of knowledge among public defenders of the same office before concluding that courts should only decline to impute knowledge within public defenders' offices where there was low risk of attorneys sharing privileged client information. *Graves*, 619 A.2d at 128-132. The *Graves* court established a rule that public defender attorneys are not associated where the public defender's office sufficiently insulates attorneys representing co-defendants. *Id.* at 133; *see Pitt*, 884 P.2d at 1156. The *Graves* court suggests that attorneys can be insulated from each other by way of "early screening of cases, structural and procedural separation, assignments to completely separate units in the same office, and other innovations in the handling of cases involving co-defendants." *Graves*, 619 A.2d at 133.

We find that the public defender attorneys in this case are not associated because they are sufficiently insulated from each other. The American Samoa Public Defender's office is on notice to operate as discrete units in co-defendant situations. *Amani*, 2 A.S.R.3d at 77-78. They screen and identify conflicts of interest early to implement "ethical wall" procedures. Furthermore, the office regularly deals with conflicts of interest as a result of the small American Samoa legal community.

Structural barriers will prevent the transfer of client information between most of the attorneys representing Majhor's co-defendants. Majhor's defense team will be physically separated from Adams and Rancourt, for these two attorneys are no longer with the Public Defender's office. Rancourt left the office before Stave joined it, so there was no risk of information sharing between these two attorneys. A natural barrier exists between Fa`alevao and the off-island attorneys outside the Public Defender's office.

Procedural barriers insulate Fa`alevao and Stave from each other. There is no need for Stave to meet or discuss Majhor's defense with Fa`alevao. *See Amani*, 2 A.S.R.3d at 78. The *pro hac vice* counsel, assisted by Stave, can negotiate plea agreements. *See id.* at 79 (discussing procedure for how the Public Defender's office can avoid conflicts of interest during plea negotiations). Stave can consult the *pro hac vice* attorney for advice on the case. Stave and Fa`alevao, as with the other attorneys involved here, have ethical obligations to protect privileged client information from disclosure. MODEL RULES OF PROF'L CONDUCT R. 1.6 (2002). In addition to these procedures, the current circumstances of the case aid Fa`alevao and Stave in protecting against the sharing of

client information. Fa`alevao's client pled to the charges of this case before Stave arrived to American Samoa and assumed responsibility for Majhor's defense. With minimal ongoing activity in Fa`alevao's case, there is less risk of accidental disclosure. Fa`alevao can safely secure his client's files. Also, the inactivity minimizes the likelihood that Stave will inadvertently hear information about Fa`alevao's case.

As a result of how the attorneys involved in this case are insulated, there is little likelihood that Majhor or other defendants will actually be prejudiced by information sharing between attorneys. We expect that the new defense team will assist Stave to adhere to his duties and to direct the use of Stave away from situations where possible conflict may be a problem, such as in cross-examination preparation. The Public Defender's office and Majhor's defense team should implement additional measures to insulate other public defender attorneys as are reasonable.

■ We find that effectively applying an exception for the Public Defender's office under these circumstances does not frustrate the policy behind the imputation rule. Imputation under Rule 1.10 gives "effect to the principle of loyalty to the client." MODEL RULES OF PROF'L CONDUCT R. 1.10 cmt. [2]. The rule promotes loyalty by: (1) preventing associated lawyers from sharing client information; and (2) cultivating a positive public perception of legal representation. *Reynoso*, 6 F.Supp.2d at 271. We are concerned about public perception because defendants will distrust attorneys if they perceive that sensitive information is not kept confidential. First, as discussed, we find that the insulation between public defender attorneys will prevent the sharing of client information. Second, we find that denying Stave's withdrawal will not undermine public perception of lawyers' conduct for numerous reasons. The segregation of the attorneys involved in this case is sufficient to assure the public of client information confidentiality. In cases unlike the one at hand, where attorneys are associated, we will impute conflicts of interest to protect client knowledge. Public defenders "do not have a financial interest in matters handled by their colleagues which might give them a motive to share confidential information." *Id.* Clients cannot manipulate the legal system by using public defender attorneys for the privileged information that they may have. *Id.* Furthermore, the public perception of another change in Majhor's local representation may diminish the public's perception of attorneys in the American Samoa bar. The many changes may appear to the public as if Majhor is not receiving loyal attorney assistance. In this case, granting Stave's withdrawal has the appearance of being a disservice to Majhor. Majhor will lose an attorney who has secured the court's authorization for expert funds from ASG, is well acquainted with the *pro hac vice* defense team, and has generally developed a good working relationship with Majhor.

B. Office Conflict—Actual

Majhor contends that the "ethical wall" insulating the attorneys at the Public Defender's office has been pierced. We disagree because we have no evidence that client information has actually been exchanged among any of the defense attorneys. Majhor only identifies potential or illusory conflicts of interest. His inability to provide better evidence of an actual conflict gives us further reason to believe that the attorneys for the co-defendants, including the public defender attorneys, were and are adequately insulated from each other.

Majhor asserts that the budgetary requirements of his defense conflict with the budgetary concerns of the Public Defender's office. Majhor believes that the resources of the Public Defender's office are insufficient to provide for his defense. However, Majhor has shown no instance where a budgetary decision prejudiced his defense. We have authorized funds necessary for Majhor's defense. By further motion, Majhor can continue to request funding where required to prepare an adequate defense. *American Samoa Gov't v. Siitu,* CR No. 06-03, slip op. at 1-3 (Trial Div. July 9, 2003).

■ Majhor asserts that the investigator and secretary of the Public Defender's office conflict Stave from representing Majhor. Majhor contends that Stave uses the same investigator and secretary as involved with the other defendants. Majhor has not shown that he has been prejudiced by "'an actual conflict of interest that affected his lawyer's performance'" or the performance of the investigator or secretary. *Burger v. Kemp,* 483 U.S. 776, 783 (1987) (quoting *Strickland,* 466 U.S. at 692 (citations omitted)). This is an unnecessary conflict. As Majhor can use another investigator and can seek funds for investigation, Majhor does not have to use the services of a conflicted investigator. As for the secretary, there is no conflict with a secretary performing basic clerical services for Stave, like answering the phone, because "members of the support staff are expected to maintain professionalism, discretion, and confidentiality." *Amani,* 2 A.S.R.3d at 80. Where Majhor's defense team or Fa'alevao doubt the continued confidentiality of particular pieces of privileged information, the attorneys can take steps to withhold information from the secretary. For example, Stave can communicate directly with the Governor's office regarding Majhor's defense funding or utilize the staff of the *pro hac vice* attorney for substantive secretarial support where necessary.

■ Majhor asserts that Fa'alevao's candidacy for Governor prejudices Majhor's defense. Majhor believes that Fa'alevao will interfere with Majhor's defense so as not to appear weak on the death penalty before the voters. This type of argument is "speculative and nothing more than a conclusion." *State v. Lovelace,* 140 Idaho 53, 61, 90 P.3d 278, 286

(Idaho Sup. Ct. 2003) (rejecting argument that a defense attorney elected to a prosecutorial position would not want to appear "soft on crime" and was conflicted). Majhor presents no evidence that Fa`alevao's campaign has actually involved the death penalty or that he has acted against Majhor's interests. In addition, Fa`alevao is insulated from Majhor's case.

Majhor argues that Stave has a conflict of interest because Assistant Public Defender Monica Abello is leaving the Public Defender's office to join the Attorney General's office.[1] This argument is meritless, because any actual conflict would impact Majhor even if Stave withdrew.

Majhor contends that Stave's workload is too heavy to accommodate Majhor's capital case. With Stave's anticipated position as local co-counsel on a capital defense team, Stave can arrange his workload so as not to prejudice Major's defense.

## III. Constitutionality of Stave's Representation

After considering Majhor's conflict of interest arguments with "special care and deliberation," we find that Stave has no conflict of interest that will deny Majhor, or his co-defendants, effective assistance of counsel. *Thompson v. Oklahoma*, 487 U.S. 815, 856 (1988). Stave's representation of Majhor has not been deficient because he has no imputed conflict of interest or actual conflict of interest. The attorneys involved are separated to sufficiently minimize the risk that information will be shared. The allegedly conflicted investigator does not need to be used by the defense and the use of the secretary can be controlled to avoid conflict. There is no conflict because of the Public Defender's budgetary issues, Fa`alevao's candidacy, or Stave's workload.

Stave's representation has not prejudiced Majhor. Majhor failed to present any evidence showing that any one involved, whether attorney, investigator, or secretary, has improperly shared client information or acted against his best interests. Moreover, with the critical stage of Majhor's defense team formation, allowing Stave to withdraw could interfere or delay the appointment of more experienced counsel for Majhor that will ensure him an adequate defense.

Majhor's reliance on *Burger v. Kemp* was unhelpful to demonstrate

---

[1] We release the portion of our opinion concerning Abello's move to the attorney general's office to both parties because it contains no privileged information. The Attorney General is fully aware that his office is hiring Abello and that she may bring conflicts of interest with her from the Public Defender's office.

Stave's alleged conflicts of interest. 483 U.S. 776 (1987). The *Burger* Court found that the attorney in question had no conflict of interest because the participation of the attorney did not "constitute an active representation of competing interests." *Id.* at 783. Here, we find that Stave does not represent competing interests.

## IV. Drug Case

For many of the same reasons as in the homicide case, CR No. 10-03, we find no conflict preventing Stave from representing Majhor in the controlled substance case, CR No. 21-03.

## V. Conclusion

We decline to allow Stave to withdraw at this critical time in the formation of the defense team. Stave can continue as counsel for Majhor until we have further evidence that privileged client information has been transferred between the counsel of the co-defendants, that the screening procedures are ineffective, or that there is any other actual conflict of interest.

## Order

Defendant's motion to withdraw is denied without prejudice.

It is so ordered.